In re the Matter of Karly
B. SUTHERLAND,
Petitioner,

v.

Fred SUTHERLAND, Respondent.

No. CS07–03151.

Family Court of Delaware,
Sussex County.

Submitted: Sept. 10, 2009.
Decided: Jan. 28, 2010.

Ashley Oland, Esquire, Law Office of Edward C. Gill, P.A., Georgetown, DE, Attorney for Karly B. Sutherland.

Seth Thompson, Esquire, Law Office of Hudson, Jones, Jaywork, and Fisher, Georgetown, DE, Attorney for Fred Sutherland.

## OPINION

HENRIKSEN, J.

After two lengthy days of trial, as well as the attorneys submitting follow-up memorandums, this is the Court's Decision and Order regarding property division, child support modification, and Wife's request for alimony.[1]

---

1.  Pseudonyms have been substituted for the names of the parties pursuant to Supreme Court Rule 7(d).

■ The Court must first address the agreement of the parties stated in their Rule 52(d) pre-trial filings wherein they stipulated to a 50/50 division of marital property. Unfortunately, it appears to the Court that there was not a clear meeting of the minds on this stipulation. Wife was willing to stipulate to a 50/50 division of marital property based upon her underlying belief that Husband had forfeited his marital interest in the parties' marital "dream home" when he executed a quit claim deed conveying whatever interest he might have in the property to Wife. Wife avers that Husband's execution of the quit claim deed of the marital "dream home" constituted a valid agreement of the parties to exclude the "dream home" from marital property pursuant to 13 Delaware Code, Section 1513(b)(3)[2]. At the same time, Wife avers that Husband continues to remain 50% liable on the sizeable outstanding indebtedness against the "dream home." Husband, on the other hand, takes the position that his execution of the quit claim deed did not constitute a valid agreement intending to exclude the "dream home" from marital property, and that the value of the "dream home," as well as the associated debt, should both be considered in the Court's division of the marital estate.

Given the Court's opinion that the quit claim deed did not result in Husband validly agreeing to exclude the value of the "dream home" from the marital property, it would be unfair for the Court to hold Wife to a 50/50 division of marital property based upon this misunderstanding of the parties.

■ The Court will therefore address the main issue in this case, that being whether the execution of the quit claim by both parties to Wife alone of their jointly owned real estate should be construed as a valid agreement of the parties, thereby excluding the real estate from the marital estate to be considered by the Court under the exceptions set forth in 13 Delaware Code, Section 1513(b)(3)[3]. In order to address this issue, it is important for the Court to first go through the history of events leading to the moment when the parties executed the quit claim deed.

The parties were married July 06, 1996. For almost the first year of their marriage, they resided in Wife's father's beach home until they were ready to move into their first family home, which the Court will call the "Townsend Court" property. The parties resided in the Townsend Court property for the next 10 years of their almost 12 year marriage. Four children were born of the marriage, all of whom are still minors. Although the parties official date of separation was October 30, 2007, testimony indicated that their marriage was going through troubled times well before the final separation date.

While the marriage was still in relatively stable condition, or at least during a time

---

**2.** DEL.CODE ANN. tit. 13, § 1513(b) reads: For purposes of this chapter only, "marital property" means all property acquired by either party subsequent to the marriage except:
(1) Property acquired by an individual spouse by bequest, devise or descent or by gift, except gifts between spouses, provided the gifted property is titled and maintained in the sole name of the donee spouse, or a gift tax return is filed reporting the transfer of the gifted property in the sole name of the donee spouse or a notarized document, executed before or contemporaneously with the transfer, is offered demonstrating the nature of the transfer.
(2) Property acquired in exchange for property acquired prior to the marriage;
(3) *Property excluded by valid agreement of the parties;* (Emphasis added.) and
(4) The increase in value of property acquired prior to the marriage.

**3.** *Id.*

when the parties had not yet contemplated divorce, Husband and Wife proceeded with a plan to purchase a new property and build their "dream home." The "dream home" property will hereafter be referred to as "Holly Mist". Their plan included purchasing unimproved real estate and financing the construction of the home on the Holly Mist property while at the same time accomplishing the sale of their Townsend Court property. Once the Townsend Court property was sold, the parties intended to apply the proceeds of that sale against the construction loan on the Holly Mist property.

"The Plan," as described in the testimony of both Wife and her father, began formally on February 18, 2006, with a written agreement involving Husband, Wife, and Wife's father. It was in this same month of February 2006, that Husband and Wife purchased in their joint names the Holly Mist unimproved real estate.

Through the course of their marriage, Husband had been rising in the ranks from a concrete worker to a supervisor of concrete workers. He had also obtained a two year degree in architectural design. Wife was a 2nd grade school teacher for the past 10 years. Wife's father, who participated considerably in "The Plan," has been a project director for a major engineering company that specializes in the industrial design and construction of major facilities all over the world.

Around the time "The Plan" was entered into, Wife's father was nearing retirement. Having a certain amount of expertise about borrowing power at the time, Wife's father realized that Husband and Wife would not be able to meet the necessary bank requirements to obtain a construction loan to build the "dream home" the couple wanted to build. In order to assist his daughter and her husband, Wife's father agreed to be the lender of construction funds by obtaining funds from his own equity line, making all payments due on his equity line during the period of construction, and being repaid by Husband and Wife at the time Husband and Wife obtained a permanent mortgage on their new home, and after sale of the existing Townsend Court home. Wife's father believed "The Plan" had a high chance of success because, at the time, the real estate market was strong, and Husband was qualified to act as the general contractor which would result in considerable savings. Wife's father prepared a cost projection in which he envisioned a 13 month construction period. Wife's father, in addition to factoring in the savings related to Husband being the general contractor, also considered Husband's employment with a construction company from which Husband could obtain materials and machinery at a reduced cost.

The Court believes one of the major flaws in "The Plan" was the manner in which checks were processed and paid to subcontractors. Under "The Plan", Wife's father signed checks in blank and gave them to Wife. Wife then filled out the checks at such times as payments needed to be made to subcontractors as identified and requested by Husband. The first draw was made in mid-March of 2006. According to Wife's father, everything was going according to "The Plan" until about November 28, 2006.

Another problem with "The Plan" was the lack of the sale of the Townsend Court property. All parties seemed to agree that the Townsend Court property had initially been overpriced by the realtor. In addition, the real estate market had begun to fall. In Wife's father's opinion, even dropping the listing price on the Townsend Court property by $100,000.00 would not defeat the success of "The Plan" to build Husband and Wife's "dream home."

But on November 26, 2006, Husband suddenly left the home and dropped out of sight. Wife did not know where Husband was living. Construction work stopped on the Holly Mist home. Work did not resume again on the home until more than two months later, when Husband returned around February 01, 2007.

During the gap of time between November 26, 2006, and February 01, 2007, Husband terminated or was terminated from his stable construction manager's job. Husband began his own concrete business with an old friend. Although Husband had dropped out of sight during this time, he and Wife still had occasional contact. It was on these occasions Wife provided Husband with checks he requested to be paid ostensibly to certain subcontractors. Apparently, love really is blind. The fallacy of Wife's and her father's trust in handing these sizeable payments of money over to Husband when he left and construction stopped is clearly recognized by any person distant from the transaction. Wife and her father now maintain that nearly $200,000.00 in checks were written during this "gap time" that were misapplied by Husband. Wife and her father believe these misapplied funds were spent on projects unrelated to the building of the "dream home," possibly being used to pay contractors on other jobs with Husband's new concrete company, or simply to fund Husband's own personal extravagances. Unfortunately, because these checks were written on Wife's father's own account, only Wife's father could have obtained copies of the checks written during this time period. However, Wife's father did not produce any of these checks which might have assisted in proving Wife and Wife's father's claim that Husband had been spending these funds on projects unrelated to the building of the "dream home" at Holly Mist. The Court is therefore unable to accept the theory of Husband misapplying the funds.

Both Husband and his partner in the new concrete business, an old friend from high school, acknowledged that Husband and his old friend foolishly spent money earned from their new business. The friend bought a Corvette through the business, which was eventually repossessed. Husband used funds from his new business to foolishly buy a big double tire truck which he did not need, a Tahoe for the family costing $43,980.00, and a used Silverado for himself costing $34,987.00. Husband's friend eventually pulled out of the business around July 2007. Husband attempted to run the business on his own. In doing so, he was trying to bid on jobs, oversee five to seven employees, and also do the bookkeeping. The combination of Husband's lack of a professional bookkeeper or accountant, a failing economy, the foolish purchase of expensive and unnecessary items, all led to the oncoming obvious failure of Husband's business by the fall of 2007. Husband finally let all of his employees go in late December 2007, except for performing one or two final jobs in January 2008.

During these obviously stressful times of a failing business, Husband and Wife separated on October 30, 2007. Wife filed for both divorce and custody on December 06, 2007. Wife filed for child support and interim alimony on December 28, 2007. It was in this climate of a failing business, a failing marriage, and badgering creditors, that Husband contacted Wife so that she could have an attorney prepare quit claim deeds of both the Townsend Court property and Holly Mist property over to Wife alone. The quit claim deeds were signed on February 11, 2008. On this same date, Husband entered into a Child Support Consent Order. On February 15, 2008, the Court entered an Order awarding Wife

interim alimony. Although Wife was represented by counsel, it does not appear Husband had the benefit of counsel until much later when his first attorney entered an appearance on May 06, 2008.

Wife's understanding of the reason for the quit claim deed transaction is critical in the Court's decision. According to Wife, and as already noted, Husband had stopped doing everything with his company in January 2008. Near the end of January 2008, Husband called Wife and very forcibly told her "you need to get those houses out of my name—do it now." Wife was unable to testify exactly what she understood Husband's meaning to be by those words. She felt the reason Husband told her to get the deeds prepared was based upon what she described as "the events" which were occurring at that time. According to Wife, when Husband called her with his very forceful instruction, she responded by saying, "What have you done now?" Husband did not give any reason for his instruction. During this same line of testimony, Wife said she understood Husband did not give up any interest in the debt owed on the property or in the gain which might be received from the sale of the property.[4]

It was obvious that Wife did not understand the ramifications of the quit claim deed. She simply said, "Personally, we had a plan ... and I followed the plan." As Wife conceded, even on the second day of testimony after she had had a chance to reflect on her earlier day's testimony, she believed, even though one of the quit claim deeds involved Husband signing his interest over to Wife on the unsold Townsend Court property, Husband was entitled to have any portion of the profit from that sale applied to the debt on the new house at Holly Mist because, according to Wife, "it was fair."

Lisa Andersen, the attorney who prepared the deeds, acknowledged she did not have discussion with either of the parties about the purpose or meaning of the deeds. Ms. Andersen confirmed that there was no separate agreement that accompanied the deeds. Ms. Andersen was not present when the deeds were signed. In fact, the deeds were signed by both parties in the presence of Wife's attorney. Ms. Andersen never spoke to Husband. Ms. Andersen was simply informed Wife needed to have the deeds done quickly.

According to Husband, he instructed his wife to get the quit claim deeds completed because creditors were after him, and he wanted to protect the real estate for his wife and children. Husband acknowledged that he had consulted a bankruptcy attorney in December 2008.

The clear purpose and intent of Husband executing the quit claim deeds, with a failing business and creditors breathing down his back, was his hope to insulate the real estate from the claims of creditors. Wife's statements, such as to her husband, "What have you done now?," and her understanding that "events" were the reason Husband was instructing her to accomplish the preparation of the deeds, clearly indicate his urgency, her somewhat understanding of the urgency, and a lack of intent by either of them that the execution of the quit claim deeds was an agreement between the two parties that Husband no longer sought any of the possible profit to be realized from the sale of the property, but was willing to accept half of the debt.

---

4. Upon returning to the stand on the next day, Wife testified she did not believe Husband would get a portion of the profit on the sale of the new home, but she agreed he was entitled to have the proceeds from the former Townsend Court property applied to reduction of the debt against the new Holly Mist property.

In *Husband R.T.G. v. Wife G.K.G.*, the Supreme Court of the State of Delaware held that a conveyance from one spouse to the other was presumptively a gift, and that the donor had the burden of proof in rebutting that presumption.[5] No one in the present case has rebutted the conveyance as being anything but a gift, except to note Husband's efforts to insulate the property from the claims of his creditors. The Court in *Husband R.T.G.* went on to hold, if the conveyance is determined to be a gift, it is presumptive marital property subject to division, with the party alleging exclusion by agreement bearing the burden of proof of the agreement.[6]

If the Court understands Wife's argument correctly, despite having no clear understanding of the purpose or effect of the quit claim deed, Wife believes the factual circumstances surrounding the timing of the quit claim deed support a finding of a valid agreement. Wife's argument has some merit when one considers that around the time the quit claim deeds were executed Wife had already filed for divorce, custody, and child support, the parties entered into a support consent on the very day the deeds were signed, and Wife had also very near this time filed a motion for expedited interim alimony. Wife argues that the case of *G.R.P. v. A.M.P.* supports the theory that the crucial timing of the quit claim deeds evidences an intent behind the deeds for Husband to transfer the entirety of his interest in the property to Wife.[7] Clearly, however, the finding by the Judge in *G.R.P.* that debts incurred post-separation to fund post-secondary education of the parties children over the legal age for support, were not debts to be considered in the marital estate, is very different from excluding from the Court's consideration of marital property the value in the major asset owned by the parties during the marriage, their "dream home," just because a deed was executed during a time when the parties' worlds were falling apart and emotions were running high due to a failing business and marriage with thought of losing everything to creditors.

According to Professor Corbin, the term agreement may mean many things, and is "frequently used as an exact synonym of the term contract."[8] Professor Corbin goes on to note, "In the law of contracts we mean by the term agreement an expression of mutual consent between two parties that frequently creates a contract."[9] In the *Kitzke v. Turnidge* case, the Oregon Supreme Court held that "A contract depends on mutual expressions of agreement, and not upon the identity of unexpressed ideas." The Oregon Court went on to state that "The law of contracts is not concerned with the parties' undisclosed intents and ideas. Instead, the law of contracts gives heed only to their communications and overt acts."[10] Professor Corbin recognizes there are certain areas of the law where the timing and context of a person's expressions may lead to a court finding a mutual assent, therefore an

---

5. *Husband R.T.G. v. Wife G.K.G.*, 410 A.2d 155, 161 (Del.1979).

6. *Id.*

7. *G.R.P. v, A.M.P.*, No. CN04–10085, 2006 WL 4041937 (Del.Fam.Ct. Apr. 19, 2006).

8. 1 Corbin on Contracts § 1.9, Agreement Defined, FN1, citing *Fitzpatrick v. Vermont State Treasurer*, 475 A.2d 1074 (Vt.1984).

9. *Id.* FN3, the footnote to the just cited quote from Professor Corbin includes the case of *Kitzke v. Turnidge*, 209 Or. 563, 307 P.2d 522, 527 (1957).

10. *Kitzke v. Turnidge*, 209 Or. 563, 307 P.2d 522, 527 (1957).

agreement.[11] Professor Corbin cites instances in the Uniform Commercial Code where a Court may find a contract between the parties based upon a prior course of dealings.[12]

The Restatement of Law on Contracts defines an agreement as "a manifestation of mutual assent on the part of two or more persons."[13] The comment to the definition of agreement contained in the Restatement notes that a manifestation of assent may be by words or by any other conduct. *Blacks Law Dictionary* defines agreement as "A mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."[14] *Blacks Law* goes on to note that an agreement is sometimes synonymously described as a contract, although, technically, not all agreements are contracts. The definition in *Blacks Law* also notes that a parties' bargain may be found in their language, or by implication from other circumstances, such as in courses of dealing. It is interesting, however, that the reference to the other circumstances in *Black's* again refers to its use in the Uniform Commercial Code.

The critical subsection of the marital property statute which is relevant to the issue before the Court states that property will be excluded as being marital property where there is a "valid agreement" of the parties. It is interesting that our legislature included the word "valid," and did not simply say "an agreement." Returning to the definition contained in *Blacks Law Dictionary*, there is a subcategory for the words "valid agreement." The subcategory refers you to the area of valid contract under the contract definition contained in *Blacks Law*.

When discussing Professor Corbin's analysis of the term agreement, one of the footnotes in the previously cited section involved the Vermont Supreme Court case of *Fitzpatrick v. Vermont State Treasurer*.[15] Vermont's Supreme Court placed special emphasis on their legislature's use of the words "special agreement" as opposed to simply using the word "agreement." The Vermont Court noted the term "special agreement" had not been previously defined, but the term "special contract" had been defined as "one with peculiar divisions or stipulations not found in the ordinary contract relating to the same subject matter, and which, if omitted, the law will not supply."[16] Citing several cases in support of its finding, the Supreme Court of Vermont determined the wording "special agreement" was synonymous with the words "special contract," and in both instances, required agreements which were express in their provisions, and not dependent on implication.

In a case closer to home, Delaware Family Court Judge Wakefield, in his 1992 Decision of *Kanigliero v. Kanigliero*, had to determine the validity of an agreement signed between a husband and a wife shortly after they married, but was intended to be construed as a prenuptial agreement. Judge Wakefield's Decision focuses on the very same statute involved in this case, that being the valid agreement exclusion from marital property un-

---

11. 1 Corbin on Contracts § 1.9.

12. *Id.*

13. Restatement (Second) of Contracts, § 3 (1981).

14. Blacks Law Dictionary (8th ed. 2004).

15. *Fitzpatrick v. Vermont State Treasurer,* 144 Vt. 204, 475 A.2d 1074 (1984).

16. *Id.* at 1077.

der 13 Delaware Code, Section 1513(b). Judge Wakefield, citing two previous Delaware Supreme Court Decisions [17], recognized married persons may validly contract with respect to their property rights. He also noted additional principals may apply in contracts between spouses to determine their validity. In upholding the contract between the parties as excluding certain property as marital property, Judge Wakefield found the contract had adequate consideration, was not subject to any fraudulent misrepresentation, the parties clearly knew what they were signing and the consequences thereof, and the contracts were exercised without any overreaching or undue influence.

In the present case, the Court is satisfied the execution of the quit claim deeds failed to contain an understanding of each of the parties to exhibit a common mind and understanding concerning the effect of the documents. The Court is also satisfied neither party, given the considerable stress at that time of a failing marriage and business, with creditors knocking at the door, had the mindset to have a full understanding of the consequences of what they were executing. There was no testimony Husband had the opportunity to review this document with an attorney before signing it. Both parties signed the document in the presence of Wife's attorney. It is doubtful any attorney explained to either of the parties the full consequences or significance of the quit claim deed. If there is any mutual understanding these parties shared when executing the quit claim deeds, it was only that the property needed to get out of the husband's name to protect it from the claims of creditors. As such, the Court holds the quit claim deeds executed by both parties

conveying title of the marital real estate to Wife alone did not constitute a valid agreement between the parties intending to exclude it from the Court's consideration of marital property.

The Court will now direct its attention to the requirements as set forth in 13 Delaware Code, Section 1513 where, in a proceeding for divorce or annulment, the Court shall, upon request of either party, equitably divide, distribute, and assign the marital property between the parties without regard to marital misconduct, in such proportions as the Court deems just after considering all relevant factors including those hereafter stated.

### The length of the marriage:

The parties were married July 06, 1996, separated for the final time on or about October 30, 2007, and divorced June 13, 2008, thereby ending a marriage of 11 years, 11 months, and 1 week. The parties have four minor children, Gia, born February 19, 2001; Elise, born January 11, 2003; Molly, born January 11, 2003; and Ellie, born March 01, 2005. The children reside full time with Wife.

### Any prior marriage of the parties:

Neither party was previously married.

### The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties:

■ Wife is 37 years of age, in good health, has a Masters Degree in School Administration, and has been steadily employed as a 2nd grade teacher for over a decade with a current income of $58,270.00.

17. *Robert O. v. Ecmel A.,* 460 A.2d 1321 (Del. 1983); *Harry M.P. v. Nina M.P.,* 437 A.2d 158 (Del.1981).

Husband is 39 years old, also in good health, has an Associates Degree in Architect Engineering, and has a long history of employment in various positions in the construction field, earning, at times, in excess of $85,000.00, but presently earning $40,250.00. Husband's present employer testified that Husband was making $57,500.00 as of January 01, 2009. Husband's pay was lowered on April 22, 2009, to $40,250.00. Husband's employer indicated that Husband's pay would hopefully increase again to $57,500.00 when Husband could be more focused on his work after his legal entanglements are resolved.

Having reviewed the occupational employment statistics of Delaware wages for 2008 for Sussex County, published by the Delaware Department of Labor, the Court finds the category most associated with Father's skills to be category 47–1011, which describes the first-line super/managers of construction trades and extraction workers. The mean income is set at $26.85 per hour, or the equivalent of an annual income of $55,848.00. The experienced hourly income is $31.21 per hour, or an annual income of $64,917.00. Between 2005 and 2008, Husband demonstrated an ability to make anywhere between $65,000.00 and $78,000.00 per year. The Court should note, however, that the economy, especially for the construction industry, was then doing much better than it is now. For purposes of these proceedings, the Court finds it appropriate to assign Husband a present annual income ability of $57,500.00.

At this point in time, Wife also enjoys health insurance benefits through her employer, while Husband does not.

In the present financial climate, which has not yet shown definite signs of improving, Wife enjoys the security of a steady income, but not an expectation of a quickly rising income for the future. On the other hand, many persons in the construction business are now out of work, and Husband is fortunate to even have employment at this time. Although a future increase in the nation's economy may afford Husband's income to increase dramatically more quickly than Wife's, the Court must base its analysis on circumstances now in effect, and not by speculating on the future. Accordingly, the Court finds no reason to favor one side or the other in their overall distribution based upon this category alone.

*Whether the property award is in lieu of or in addition to alimony:*

The Court will be awarding Wife alimony, but for a limited period of time.

*The opportunity of each for future acquisitions of capital assets and income:*

■ Any ability either party may have to acquire future capital assets and income, other than the speculative nature of a future boom in the economy which would more likely benefit Husband than Wife, will result from the distribution of proceeds from the sale of the parties' marital home, if that needs to occur. As such, the Court does not find either party to be favored in this area.

*The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as a homemaker, husband, or wife:*

■ By his own admission, Husband likely suffered the ruination of his business at his families' expense when, for no apparent reason, he exited the scene for a few months at a time when he should have been concentrating on building their new home. He also either left or was terminat-

ed from stable employment to enter into a business venture with a high school friend where they both foolishly spent sums of money eventually bringing creditors knocking at the door. Meanwhile, Wife, fortunately with her father's assistance, was doing everything she could to maintain the stability of her family, support their children financially and emotionally, and continue paying their financial obligations to avoid financial disaster. The Court therefore awards Wife 10 percentage points in its overall division of assets.

### The value of the property set apart to each party:

Although the Court questions Wife's ability to afford keeping the former marital home, the Court is prepared to award Wife the former marital home with an assigned value of $650,000.00.[18] If Wife is going to be able to keep the property, she is going to have to be responsible for the existing mortgage against the home together with the money the parties owe to Wife's father for payments he made out of his own pocket, the total sum of these combined amounts being $352,621.00.[19] Wife will also need to have Husband's name removed from the liabilities against the home. In addition, Wife is assigned as her sole and separate property free and clear of any right of Husband a 403b Milford School District Plan (approximately $4,000.00), her contributory State Pension Plan (approximately $9,750.00), and her Deferred Compensation Plan (approximately $2,560.00). Although the Court when totaling these plans comes up with a slightly different figure, the parties indicated in Court that the combined value was $15,033.81. The Court will abide by the agreement of the parties on the valuation of Wife's retirement related plans. Any automobiles that either party may have had are now titled separately, and, the parties agreed, are assigned to the respective parties without attribution of value. The Court also understands the remaining personal property belonging to the parties has been previously divided between them without attribution of value.

Using the foregoing figures, Husband is assigned nothing in value, and Wife is assigned a net value of $312,412.81.

### The economic circumstances of each party at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the party with whom any children of the marriage will live:

Neither party's economic circumstances are much better than the other's, except that Wife perhaps will have the help of her father who has already given up a considerable amount to assist his daughter. Because the children are living with Wife, and because she desires to retain the home, the Court is willing to permit that possibility, so long as she can meet the terms finally set forth in this Order. Because of the young age of the children, the Court is unwilling to simply permit Wife to remain in the property without paying Husband his interest until the youngest child becomes 18, or until Wife remarries. If the Court were to take such an approach in this case, it would be an unreasonable delay to Husband for him to re-

---

18. The Court was satisfied with the present appraisal of Elizabeth Reagan who appraised the property as of August 22, 2009.

19. The Court understands that $322,022.00 was the estimated balance on the Sun National Bank loan as of September 09, 2009, with an additional $30,595.00 paid out by Wife's father with his credit cards.

ceive his share of the marital property, all of which is tied up in the home.

The Court should also note, as is often common in divorces, two people can often live more cheaply together than apart, and two people's combined incomes can often afford a higher standard of living than either can afford individually. Although the Court is providing Wife with the opportunity to keep the marital home, the Court has concerns about Wife's ability to afford the home on her income. The Court is also unwilling to require Husband to pay alimony to permit Wife to maintain a home that appears to be well above her means, and in which the parties never established a lengthy style of living together.

*Whether the property was acquired by gift, except those gifts excluded by subsection (b)(1) of this section:*

Not applicable.

*The debts of the parties:*

In addition to the obligation owed on the real estate totaling $352,621.00, as already discussed, Husband has agreed to reimburse Wife the following amounts which Wife paid out of her own sums following the parties' separation to hold off creditors of Husband's business:

| | |
|---|---|
| Newark Concrete | $6,593.00 |
| Atlantic Concrete | $8,340.00 |

In addition, Husband has agreed to pay Wife attorney's fees for a Rule to Show Cause Order issued in December 2008, in the amount of $1,721.25.

*Tax consequences:*

As to property between the parties, neither party has informed the Court of any possible tax consequences which might result from this distribution of property.

*Other factors:*

Wife prepared an exhibit showing both amounts of child support and interim alimony the Court had previously ordered. A portion of Wife's calculations were based upon an original inflated amount of income which Husband had fraudulently presented based upon his attempts to get a bank loan. Husband's inflated amount of income, which he presented at a time when he apparently had no intent of paying either child support or interim alimony, created an inflated responsibility for Husband based upon his own fraudulent information. The original Child Support Order in the amount of $2,783.00 was entered by stipulation of the parties dated February 11, 2008. The original Interim Alimony Order, using information from the Child Support Stipulation, was entered on February 15, 2008. In a subsequent Order dated February 09, 2009, in which the Court granted Husband relief from judgment, the Court revised Husband's support and interim alimony obligations to the more realistic figures based upon his actual income. The Court required monthly child support of $1,640.00 and monthly interim alimony of $2,400.00. The total of those two obligations up to the time of trial, a period of 21 months, came to $84,840.00. Although Wife has sought arrearages based upon the original inflated Orders plus the subsequently modified Orders, the Court is only willing to award arrearages on these obligations using the correct modified amounts issued in the Court's Order of February 09, 2009, but going retroactive to the Orders in February 2008.

Wife's records indicate that she has received payments from Husband for these obligations of $11,545.32 on the child support and $12,445.84 on the interim alimony, for a combined payment of $23,991.16. Husband therefore owes Wife as of the

date of the Property Division Hearing in September 2009, arrearages on child support and interim alimony in the aggregate amount of $60,848.84.

Having reviewed all the foregoing factors, the Court finds it fair and equitable to divide and distribute the marital property on a 60/40 basis favoring Wife. Given the net value of the estate of $312,412.81 has been assigned entirely to Wife, noting that she has the responsibility for repaying the mortgage and any other obligations owed to her father, Wife needs to pay Husband the sum of $124,965.12. However, this amount is reduced by Husband's obligation on child support and interim alimony arrearages to Wife of $60,848.84 as well as the obligation for Husband to reimburse Wife on the payout she made to Newark Concrete, Atlantic Concrete, and for the Rule to Show Cause attorney's fees, totaling $16,654.25. As such, Wife needs to pay Husband the sum of $47,462.03 no later than June 01, 2010, unless earlier required pursuant to this Order.

In addition, Wife needs to be sure that Husband is removed from all liability whatsoever on the mortgage obligation related to the marital home with Sun Trust, or any other loan against the Holly Mist property, and also on the obligation owed to Wife's father. If Husband's name appears on the Sun Trust mortgage, Wife will need to obtain the release of Husband on that mortgage, or she will need to refinance the same so that Husband is no longer liable thereon. Wife will also need to obtain a release of liability from her father releasing Husband on any liability on the monies owed to her father. In return, and upon receipt of the foregoing assurances and the sum of $47,462.03, Husband shall execute any further assurances Wife or any lender may require, if any, that Husband no longer holds any interest whatsoever in the real estate located at Holly Mist.

**IT IS SO ORDERED.**

### *Alimony*

In a Motion for Interim Alimony filed by Wife on December 28, 2007, Wife sought interim alimony in the amount of $6,889.56 per month. Husband failed to file an answer. In an Order dated February 15, 2008, the Court ordered Husband to pay Wife interim alimony in the amount of $3,500.00 per month. This Order was entered under the falsified and incorrect information provided by Husband as to his salary, where in a Child Support Stipulation entered very close to the same date, Husband indicated he was making $8,3333.00 per month or the equivalent of approximately $100,000.00 per year. Perhaps it was not Husband's intention to defraud the Court in overstating his income, but a fraudulent pay stub he had created in order to obtain a bank loan which formed the basis of determining his salary, certainly effected these proceedings. Although Husband knowingly overstated his income, and therefore his ability to pay, the Court was most disturbed that Husband made absolutely no attempt to pay anything on either of his over-calculated child support stipulation or his over-calculated interim alimony Order.

When calculating the initial interim alimony amount in its Order of February 15, 2008, Wife's income was correctly stated at $55,428.00 per year, or $4,619.00 per month. In that initial Decision, the Court found Wife's reasonable monthly expenses to be $10,371.75. Wife's expenses were extremely high at that time because she was responsible for paying the mortgage and utilities on both the unsold home at Townsend Court and the mortgage and utilities and related expenses on the home being built at Holly Mist. Now that the

Townsend Court property has sold, Wife no longer has to pay the $862.00 per month mortgage, nor the various other related utility and insurance expenses for the home which added approximately an additional $300.00 per month.

With Father paying absolutely nothing on his child support stipulated Order and Interim Alimony Order, both of which required Husband to pay more than he should because of the inflated and fraudulent figures he had provided, the matter then came to Court on December 08, 2008, on Wife's Rule to Show Cause Petition. Husband disclosed at the December 8th Rule to Show Cause Hearing his participation in the fraudulent creation of a pay stub so that he could use it to show a lender in order to obtain a loan. The testimony at that hearing lead the Court to find, "Husband abandoned his family and his financial responsibilities to them." Husband's failures caused Wife to suffer through financial hardship, and also required Wife's father to leverage his own real estate to assist Wife in meeting the ongoing obligations. Wife's father had to therefore cease contributions to his own deferred compensation plan, and he had to cancel his anticipated retirement. The Court found Husband in civil contempt, and committed Husband to the Department of Corrections until he was able to make certain payments to begin purging his serious arrearage in child support and interim alimony. Husband remained incarcerated for more than two months, through the Christmas holiday, until he was released on February 10, 2009. Husband was only able to obtain his release after the Court reduced Husband's obligations for posting various sums to begin reducing his arrearages. In the Decision of the Court, dated February 06, 2009, the Court determined Husband's appropriate

yearly income to be $57,500.00. In doing so, the Court recalculated Husband's child support obligation to be reduced to $1,640.00 per month and his interim alimony obligation to $2,400.00 per month. This Order was entered under the continued assumption that Wife was paying mortgages on the home the parties had lived in, and also on the home that the parties were in the process of building at the time of their separation.

As a result of Husband's fraudulent representations to the Court and his financial abandonment of his obligations to his children and his wife, Husband spent over two months incarcerated. Although the Court is not permitted to consider fault when dividing marital property, Husband's abandonment of his financial obligations was clearly considered in that portion of the Court's marital property division involving the contribution and dissipation of assets.

Although Wife now has testified to expenses in excess of $8,000.00 per month, which includes mortgage expenses related to the "dream home" in which Wife is now residing with the children of almost $3,100.00 per month, Wife contends that the $900.00 per month Husband is seeking for rent is excessive. Wife feels it is appropriate for Husband to continue to live off of friends because of Husband's "own dishonesty and poor choices," and "due to his own misconduct." [20] Wife is also stressing Husband should be attributed with an income of at least $85,000.00 annually in determining his alimony obligation. The Court does not agree with Wife's assessment, and, in the property section of this Opinion, has already determined that Husband would be attributed with a yearly income of $57,500.00. Wife would also prohibit Husband from driving anything but a work related vehicle and wants to

---

**20.** Wife's post trial memorandum.

limit Husband to no more than $50.00 per month for gasoline.

Wife's claim for alimony troubles the Court, especially when reviewing certain portions of the statute which guides the Court in making its final determination.[21] First of all, any alimony award the Court might make shall be "without regard to marital misconduct."[22] Thus, although Wife is suggesting that Husband's standard of living should be well below the standard to which the parties were accustomed during the marriage because of his misconduct, the Court is not permitted to do so. Wife is requesting Husband be left to live at an extremely minimal standard of living through the good graces of a friend, while Wife and the children live in the "dream home" that Husband and Wife together hoped to achieve but never lived in during their marriage.

Another specific factor the Court must consider in determining the amount of alimony is the standard of living established during the marriage.[23] As already noted, the parties initially lived in a dwelling owned by Wife's father while the Townsend Court property was being built. During the next 10 years of their marriage, and certainly up to the date they separated, Husband and Wife resided in the Townsend Court property. The Townsend Court property consisted of 1,810 square feet, and the parties were paying a mortgage of $862.00 per month. The additional utilities, taxes and home owner's insurance related to living in the Townsend Court property added on another $300.00 per month. Thus, in the Townsend Court property, the parties' joint obligations relating to their mortgage payment and other real estate relat-

ed expenses was about $1,200.00 per month.

The parties never lived together in their "dream home" at Holly Mist. The Holly Mist property is almost three times larger than the Townsend Court property, having 5,200 square feet. The monthly mortgage payment to maintain the debt on the Holly Mist property is $3,090.89. Wife is also seeking in excess of an additional $1,100.00 per month in utilities, insurance, and property tax related expenses to maintain and live in the parties' "dream home." Quite frankly, even if the parties had remained together, and Husband was having a banner year where he could make $100,000.00 per year, the Court has serious doubts that this couple could have maintained the "dream home" under the best of circumstances. It is clear, however, the standard of living these parties enjoyed during their marriage included a monthly mortgage and property related expenses of approximately $1,200.00 per month while living together, while Wife now is expecting Husband to pay alimony based in part upon over $4,200.00 per month in home related expenses. The "dream home" is almost three times bigger than the Townsend Court home the parties were accustomed to during the marriage. The debt load is more than three times bigger.

The time for maintaining the status quo which was in existence at the time the parties separated, that being maintaining the ongoing financial obligations created in the middle of building a home, must now come to an end. The statute prohibits this Court from penalizing Husband for Wife's benefit by ignoring the standard of living actually established and enjoyed by these parties together during the marriage. If Wife is unable to sustain the obligations on

**21.** DEL. CODE ANN. tit. 13, § 1512 (1999).

**22.** tit. 13, § 1512(c).

**23.** tit. 13, § 1512(c)(3).

the Holly Mist property given the Court's new award of alimony, she may have to consider selling that property. The Court's Order also recognizes the need for Wife to have a certain amount of time to analyze her abilities and to make arrangements to sell the Holly Mist property if necessary.

The Court has determined Wife's annual income is $58,270.00. Although she might be able to make a greater income in a higher position in the educational system, for which she is qualified, the Court recognizes the need for Wife to have the time with her young children which her present position affords.

In the 52(d) Ancillary Pre–Trial Stipulation filed with the Court, Wife lists expenses totaling $8,063.81 per month. In addition to that, Wife's testimony added $980.43 per month in payments she is having to make for attorney's fees. Husband also has claimed a monthly attorney's fee expenses of $1,456.00 per month. The Court is not going to consider either of these expenses in its calculation of alimony. However, the Court will be entertaining applications from either side for attorney's fees to be paid by the other.

The expenses Wife has listed, and those the Court has permitted as reasonable, are set forth in the attached Exhibit A. The most prominent adjustment appears in the amount the Court has awarded Wife for her monthly mortgage payment and real estate related expenses. Wife has requested $200.00 per month repairs for a minivan which has an excess of 140,000 miles. The Court believes that both parties are entitled to have transportation. As such, the Court has awarded $420.00 per month to each of the parties for any combination of an automobile payment and/or maintenance. Although the Court

initially had concerns that Wife's request for $600.00 per month in work related daycare was excessive, Wife's testimony convinced the Court that the request is appropriate. Overall, the Court has awarded Wife expenses totaling $3,197.92 per month.

The Court has attributed Husband with income of $57,500.00 per year. Husband's list of expenses include a newly calculated $1,514.00 per month required in child support. The Court disallowed Husband's $400.00 per month request to pay Dr. Wilson relating to the custody litigation between these parties, because the Court understands he has not paid Dr. Wilson. As already noted, the Court has already disallowed Husband's monthly request for attorney's fees. The Court also disallowed Husband's request for a monthly life insurance premium. It is the Court's understanding that Husband unfortunately allowed the insurance to lapse. The expenses Husband has sought, and those found to be reasonable by the Court, are set forth in Exhibit B. The Court has awarded Husband reasonable monthly expenses, including his child support, of $3,873.00 or the equivalent of $46,476.00 per year.

Although Wife's gross income and her yearly child support exceed her yearly expenses, the Court has not yet taken into account the various income tax consequences of the parties, after which Wife may not have sufficient funds to meet all of her expenses.

Since the parties were married for less than 20 years, the maximum time that Wife would be eligible to receive alimony from Husband is for a period that would not exceed 50% of their 11 year, 11 month, one week marriage.[24]

24. tit. 13, § 1512(d).

In arriving at its decision on what alimony Wife is entitled to, the Court has considered all of the other factors in 13 Delaware Code, Section 1512(c).[25] Both of these individuals are in good health both mentally and physically. Fortunately, both of these individuals are also young enough where there are still many opportunities in life available to them. At this time in Wife's life, especially with her young children, the Court does not expect her to acquire any additional education or training in order to attempt to earn a greater income. Unfortunately, although these parties may have lived well within their means for much of the duration of their marriage, the decision to jump drastically to a much more expensive home, even if Husband had not abandoned the families' needs for a certain amount of time, has placed both of the parties in a situation where neither of them will likely end up with considerable separate property to provide for their needs independently. Both of these parties contributed to the marriage the majority of their time together, except when Husband suddenly abandoned his obligations. Husband was able to obtain some additional education to improve his ability to earn money. Wife has remained consistent in her dedicated commitment to her career as a teacher.

Neither of these parties have foregone or postponed any economic, education, or other employment opportunities during the course of the marriage for the benefit of the other.

Thus, the focus of this case falls upon three major factors. The Court has already discussed the standard of living established during the majority of the marriage and the major jump above that standard of living near the end of the marriage which has now placed both of the parties in serious financial jeopardy. The Court was willing to assist Wife, and require Husband, in maintaining an interim status quo to maintain support for the children and avoid financial disaster through the prior Orders of child support and interim alimony. But the time has now come to recognize the realities of the parties' financial abilities, and to consider any future alimony award in light of the standard of living established during the majority of the parties' marriage without regard to fault. In doing so, the Court must also consider the ability of Husband to meet his needs while paying alimony.

The final determining factor is the tax consequences involved, in which Wife receives various tax benefits by having the children live with her, but where alimony

---

**25.** (c) The alimony order shall be in such amount and for such time as the Court deems just, without regard to marital misconduct, after consideration of all relevant factors, including, but not limited to:

(1) The financial resources of the party seeking alimony, including the marital or separate property apportioned to him or her, and his or her ability to meet all or part of his or her reasonable needs independently;

(2) The time necessary and expense required to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment;

(3) The standard of living established during the marriage;

(4) The duration of the marriage;

(5) The age, physical and emotional condition of both parties;

(6) Any financial or other contribution made by either party to the education, training, vocational skills, career or earning capacity of the other party;

(7) The ability of the other party to meet his or her needs while paying alimony;

(8) Tax consequences;

(9) Whether either party has foregone or postponed economic, education or other employment opportunities during the course of the marriage; and

(10) Any other factor which the Court expressly finds is just and appropriate to consider.

received by Wife will be taxable, and alimony paid by Husband will be deductible. The Court is assisted in this endeavor through use of the 2009 version of a computer program known as the "FinPlan." The FinPlan calculates the potential tax implications of an alimony award for both parties.

In performing the calculations for the FinPlan in this particular case, the Court first recalculated the amount of Husband's child support responsibility given the respective incomes determined by the Court in this Decision to be appropriate. This calculation was made with the use of the Delaware Family Court Melson Formula. In addition to including the respective incomes of the parties and their various deductions, the Court also included a monthly child care expense of $600.00. According to the calculation, Husband's child support responsibility has dropped from $1,640.00 per month to $1,514.00 per month.[26] Most likely, the drop in the amount of child support from the previous figure of $1,640.00 per month is due to a drop in the necessary monthly child daycare from $1,000.00 per month to $600.00 per month.

The FinPlan printout is attached as Exhibit D. The calculations demonstrate Wife is over budget by the amount of $1,286.00 annually, or $107.00 monthly, while Husband is operating at a shortfall of $4,114.00 per year, or $343.00 per month. Wife is therefore not dependent. Wife is not entitled to alimony beyond the period the Court is permitting Wife to resolve the problem of maintaining and perhaps selling a house that is far above the means of the parties to afford and was never established as a standard to which the parties were accustomed during the marriage.

For the reasons set forth herein,

IT IS HEREBY ORDERED:

1. Effective February 01, 2010, Husband's child support obligation shall be reduced from $1,640.00 per month to $1,514.00 per month.

2. Effective March 01, 2010, Husband's alimony obligation shall decrease from $2,400.00 per month, payable on the first of each month, to $2,000.00 per month, payable on the first of each month.

3. Husband's alimony obligation to Wife shall cease when either party dies, Wife remarries or cohabits under the definitions of Delaware law, or June 01, 2010, whichever event first occurs.

### Attorney's Fees

The parties shall have 15 days from the mailing date of this Order in which to file any requests for attorney's fees, including a memorandum in support thereof as well as the necessary affidavit in support thereof. Each party shall thereafter have 15 days in which to respond to any application made for attorney's fees.

IT IS SO ORDERED.

**EXHIBIT A**

| ITEM | REQUESTED EXPENSES | ALLOWED EXPENSES |
|---|---|---|
| WIFE'S EXPENSE INFORMATION | | |
| Mortgage/Rent | $3,091.00 | $1,500.00 |
| Electric | $ 275.00 | $ 200.00 |
| Gas/Propane/Oil | $ 460.00 | $ 300.00 |

**26.** See Melson calculation at Exhibit C.

## EXHIBIT A

| | | |
|---|---|---|
| Homeowner's Insurance | $ 100.00 | $ 100.00 |
| Property Taxes | $ 217.00 | $ 217.00 |
| Community Properly Due | $ 5.00 | $ 5.00 |
| Service Contract for Heat Pump and Water Heater | $ 120.00 | $ 21.00 |
| Complete Unfinished Work at Hudson Mill | $ 84.00 | –0– |
| Toys and Presents | $ 117.00 | $ 117.00 |
| Life Insurance | $ 68.00 | $ 68.00 |
| Cryogenic Storage Chord Blood | $ 10.00 | $ 10.00 |
| Telephone (landline, cable, internet) | $ 110.00 | $ 110.00 |
| Cell Phone | $ 26.00 | $ 26.00 |
| Household Items/Repairs | $ 150.00 | $ 150.00 |
| Trash | $ 21.00 | $ 21.00 |
| Groceries/Cosmetics/Toiletries | $ 867.00 | $ 600.00 |
| Teacher Expenses | $ 40.00 | $ 40.00 |
| Delaware State Education Dues | $ 59.00 | $ 59.00 |
| Lawn | $ 120.00 | $ 80.00 |
| Laundry/Clothing/Dry Cleaning | $ 50.00 | $ 50.00 |
| Health Insurance | $ 61.00 | $ 61.00 |
| Dental Insurance | $ 54.00 | $ 54.00 |
| Vision Insurance | $ 11.00 | $ 11.00 |
| Medical Out–of–Pocket | $ 100.00 | $ 50.00 |
| Gasoline—Car | $ 217.00 | $ 217.00 |
| Car Insurance | $ 95.00 | $ 95.00 |
| Auto—Payment/Repairs | $ 200.00 | $ 420.00 |
| Religious Donations | $ 40.00 | $ 40.00 |
| Newspapers/Magazines | $ 15.00 | $ 15.00 |
| Children's Summer Programs | $ 25.00 | $ 25.00 |
| Work Related Daycare | $ 600.00 | $ 600.00 |
| School Lunch | $ 30.00 | $ 30.00 |
| Kids' Books | $ 20.00 | $ 20.00 |
| Kids' Dance Lessons | $ 188.00 | $ 188.00 |
| Kids' Swim Lessons | $ 100.00 | $ 100.00 |
| Entertainment with Kids | $ 50.00 | $ 50.00 |
| Kids' Clothing | $ 100.00 | $ 100.00 |
| Kids' Crafts | $ 40.00 | $ 40.00 |
| Girl Scouts | $ 20.00 | $ 20.00 |
| Roller Skates—Grace | $ 12.00 | $ 12.00 |
| Bed—Eve | $ 100.00 | –0– |
| Attorney's Fees | $ 980.00 | –0– |
| Barber/Hairdresser | –0– | $ 30.00 |

## EXHIBIT A

| | | |
|---|---|---|
| Dr. Wilson | –0– | –0– |
| **TOTALS** | **$9,048.00** | **$5,852.00** |

## EXHIBIT B

### HUSBAND'S EXPENSE INFORMATION

| ITEM | REQUESTED EXPENSES | ALLOWED EXPENSES |
|---|---|---|
| Mortgage/Rent | $ 900.00 | $ 900.00 |
| Electric | $ 75.00 | $ 75.00 |
| Sewer | $ 50.00 | $ 50.00 |
| Water | $ 35.00 | $ 35.00 |
| Child Support | $1,514.00 | $1,514.00 |
| Toys and Presents | $ 20.00 | $ 90.00 |
| Life Insurance | Lapsed | |
| Telephone (landline, cable, internet) | $ 60.00 | $ 60.00 |
| Household Items/Repairs | $ 125.00 | $ 100.00 |
| Trash | $ 35.00 | $ 35.00 |
| Groceries/Cosmetics/Toiletries | $ 270.00 | $ 270.00 |
| Laundry/Clothing/Dry Cleaning | $ 70.00 | $ 70.00 |
| Gasoline—Car | $ 100.00 | $ 100.00 |
| Car Insurance | $ 89.00 | $ 89.00 |
| Auto—Payment/Repairs | $ 420.00 | $ 420.00 |
| Entertainment with Kids | $ 50.00 | $ 50.00 |
| Attorney's Fees | $1,456.75 | –0– |
| Barber/Hairdresser | $ 15.00 | $ 15.00 |
| Dr. Wilson (Not paying) | $ 400.00 | –0– |
| **TOTALS** | **$5,684.75** | **$3,873.00** |

## EXHIBIT C

# Family Court of the State of Delaware
## Child Support Calculation

Name: _____  
Pet. # _____

Calculation Date: January 21, 2010  
Period Covered: prospective

| | | | wages | self | taxable | nontax | | Father | Mother | |
|---|---|---|---|---|---|---|---|---|---|---|
| **NET INCOME AVAILABLE** | 1 | Gross Income | | | | | 1 | 4792 | | |
| | | Father | 4792 | | | | | 4792 | | |
| | | Mother | 4856 | | | | | | 4856 | |
| | 2 | Taxes | Federal | FICA | State | local | | 1303 | | |
| | | Father | 728 | 367 | 209 | | 2 | 1303 | | |
| | | Mother | 744 | 371 | 212 | | | | 1327 | |
| | 3 | Deductions | Medical | Pension | Union | Alimony Pd | | | | |
| | | Father | | | | | 3 | | | |
| | | Mother | 126 | 146 | 52 | | | | 324 | |
| | 4 | Self Support Allowance | | | | | 4 | $1,070 | $1,070 | |
| | 5 | Net Income after Self S. (Line 1 - Lines 2, 3, & 4) | | | | | 5 | $2,418 | $2,135 | |
| | 6 | Number of children supported NOT of this union | | | | | 6 | | | |
| | 7 | Adjustment for support of dependent children (table) | | | | | 7 | 100% | 100% | **TOTAL** |
| | 8 | Net Available for Primary Support (Line 5 x Line 7) | | | | | 8 | $2,418 | $2,135 | $4,553 |
| **PRIMARY** | 9 | Share of Net Available for Primary Support | | | | | 9 | 53% | 47% | 100% |
| | 10 | Number of children of this union in each home | | | | | 10 | | 4 | 4 |
| | 11 | Primary Support Allowance | | | | | 11 | 1340 | 1340 | |
| | 12 | A - Childcare Expenses | | | | | 12A | 600 | 600 | |
| | | B - Private School \| other primary | | | | | 12B | | | |
| | 13 | Total Primary Need (Line 11 + Line 12A + Line 12B) | | | | | 13 | | | 1940 |
| | 14 | Primary Support Obligation (Line 9 x Line 13 Total) | | | | | 14 | 1028 | 912 | |
| **SOLA** | 15 | Net Available for SOLA (Line 8 - Line 14) | | | | | 15 | 1390 | 1,223 | |
| | 16 | Standard of Living Adjustment % (table) | | | | | 16 | 35% | 35% | |
| | 17 | A - SOLA (Line 15 x Line 16) | | | | | 17A | 486 | 428 | 914 |
| | | B - SOLA per child (Line 17A Total / Line 10 Total) | | | | | 17B | | | 229 |
| | 18 | Gross Obligation (Line 14 + Line 17) | | | | | 18 | 1514 | 1340 | |
| **CREDITS** | 19 | Primary/SOLA retained (Line 10 x Line 17B + Line 11) | | | | | 19 | | 2256 | |
| | 20 | Child Care/Tuition paid (Line 12A + Line 12B) | | | | | 20 | | 600 | |
| | 21 | A - Parenting Time Percentage (table) | | | | | 21A | | | |
| | | B - PT Adjustment (Line 21A x other parent's Line 19) | | | | | 21B | | | |
| | 22 | A - Self Support Protection Percentage (table) | | | | | 22A | 100% | | |
| | | B - Self Support Protection (Line 5 x Line 22A) | | | | | 22B | 2418 | | |
| | 23 | **Net Obligation** (L18 - L19, L20 & L21B but not more than L22B) | | | | | 23 | **1514** | | |

### Other Dependent children

| # Ch. | Percentage |
|---|---|
| 0 | 100% |
| 1 | 82% |
| 2 | 73% |
| 3 | 67% |
| 4 | 61% |
| EA | minus 3 |

### Primary Allowances, SOLA % and Minimum Orders

| # Children | Primary | SOLA | Minimum |
|---|---|---|---|
| 1 | 480 | 16% | 96 |
| 2 | 790 | 24% | 158 |
| 3 | 1070 | 30% | 214 |
| 4 | 1340 | 35% | 268 |
| each add'l | 240 | 3% | 48 |

### Parenting Time

| Overnights | PT % |
|---|---|
| up to 109 | 0 |
| 110 - 132 | 10 |
| 133 - 150 | 20 |
| 151 - 164 | 30 |
| 165 - 174 | 40 |

### Self Support Protection

| other children | children for whom support is sought | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4+ |
| 0 | 100 | 100 | 100 | 100 |
| 1 | 50 | 60 | 70 | 75 |
| 2 | 40 | 50 | 60 | 65 |
| 3 | 30 | 40 | 50 | 55 |
| 4+ | 25 | 35 | 45 | 50 |

## EXHIBIT D

### SPLIT SCREEN SUPPORT SUMMARY

| Filing Status | Single | Hd Hstd | | |
|---|---|---|---|---|
| No. of Children 17 and Over | 0 | 0 | Child Support % | 0% |
| No. of Children Under 17 | 0 | 4 | Child Support | 18,168 |
| Monthly Budget Amount | 2,359 | 5,852 | Alimony | 0 |
| Salary from Basic Input | 57,500 | 58,270 | Non-Taxable | 0 |
| Self-Employment Income | 0 | 0 | Maintenance | |

| | 2009 ANNUAL | | Total | 2009 MONTHLY | |
|---|---|---|---|---|---|
| After Tax Cash for Living Expenses | 24,194 | 71,510 | 95,704 | 2,016 | 5,959 |
| % Share | 25.3% | 74.7% | 100% | | |
| Budget Cash | 28,308 | 70,224 | 98,532 | 2,359 | 5,852 |
| Over/Under Budget | (4,114) | 1,286 | (2,828) | (343) | 107 |
| Cash for Child Support | 42,362 | 53,342 | 95,704 | Payor's % | 44.26% |
| Child Support Annual | (18,168) | 18,168 | 1,514 | Per Month | |
| Taxes Saved Child Dep Exempt | 0 | 2,707 | 2,707 | | |
| Taxes Saved Under 17 Child C | 0 | 4,000 | 4,000 | Alimony which meets receiver budget 0 | |
| Child Credit not Allowed | 0 | 0 | | | |
| Federal Taxable Income | 48,150 | 31,670 | | | |
| Alt Min Tax Incl in Federal Tax | 0 | 0 | 0 | Max 2009 Alimony No Recapture 15,000 | |
| Marginal Tax % Includ. State Tax | 30.6% | 20.6% | | | |
| Adjusted Gross Income | 57,500 | 58,270 | | | |
| Federal Income Tax | 8,225 | (1,047) | 7,178 | Child Support % based on | |
| State Income Tax | 2,514 | 1,517 | 4,031 | Net Cash Both | 19% |
| Local Income Tax | 0 | 0 | 0 | | |
| Additional Federal Tax from | 0 | 0 | | | |
| High Income Child Dependency | | | | | |
| Exemption Phaseout Reduction | | | | | |
| (2/3 of reduction is eliminated in 2009) | | | | | |

January 27, 2010 10:54 AM

© 2009 Thomson Reuters/West. All rights reserved.